TENNILLE et al. v. HOWDEN.

(Circuit Court of Appeals, Fifth Circuit. March 15, 1910.)

No. 1,990

ESTOPPEL (§§ 62, 78*)—DENIAL OF AGREEMENT—CONTRACTS RELATING TO PER-
SONAL PROPERTY—PART PERFORMANCE.

Defendant who held an option for the purchase of a tract of phosphate
land in Florida, with another whom he had associated with him in the mat-
ter entered into a contract with complainants by which the latter agreed
to procure the money to purchase the land and to form a company to mine
the same on terms therein stated. Afterward, defendant stated that he
had an opportunity to make a more profitable disposition of the option,
and after negotiations complainants authorized him to do so providing
the contract was satisfactory to them, and in such case they were to re-
ceive 45 per cent. of any profit made and defendant and his associate 55
per cent. The proposed contract was submitted to them and approved
after the addition of a provision by them authorizing defendant to assign
his interest therein or any part thereof. As executed, the profit was to
accrue from royalties as the mines were worked. *Held*, on the evidence,
that defendant clearly understood that complainants insisted on an as-
signment of their interest in the contract as a condition of surrendering
their right to the option, and, by consummating the contract with such
knowledge, assented to the same, and was estopped to deny such agree-
ment; also, that the agreement was one which would be specifically en-
forced in equity, complainants' right to 45 per cent. of the profits of the
contract being undisputed.

[Ed. Note.—For other cases, see Estoppel, Dec. Dig. §§ 62, 78.*]

Appeal from the Circuit Court of the United States for the South-
ern District of Florida.

In Equity. Suit by George F. Tennille and others against F. J.
Howden. Decree for defendant, and complainants appeal. Reversed
and rendered.

W. E. Kay and H. W. Johnson, for appellants.
Wm. H. Baker and David C. Barrow, for appellee.

Before PARDEE and McCORMICK, Circuit Judges.

McCORMICK, Circuit Judge. In the month of February, 1907,
and for some years before that, F. J. Howden, the appellee, a subject
of Great Britain, was living in Florida, and was the general manager
of the Prairie Pebble Company, of which one Mr. Hull was president,
largely engaged in mining and marketing phosphates. While so occu-
pied, the appellee acquired from John A. Hertz, of the city of Charles-
ton, S. C., an option to purchase 140 acres of phosphate land, described
in the writing taken to purchase the same at the sum of $40,000 cash,
and the further sum of 10 cents per ton royalty for each and every
ton of phosphate rock found in the property as determined by the
prospect then being made by J. H. Pratt. This option the appellee
endeavored to dispose of to the Prairie Pebble Company, but Mr. Hull,
the president, with whom he attempted to negotiate, would not take the
matter up at that time thinking that he could get the land later on,

and that it was too small a proposition for him to handle, and, if his mine should ever reach into that neighborhood, he could buy it at a less price. The appellee, being connected with the Prairie Pebble Company officially, and closely engaged as the general manager thereof, could not spare the time to raise a company to handle the proposition himself, and consequently had to associate himself with some one who had the time to devote to it. At this time and under these circumstances he was introduced to Mr. Brown Caldwell by Mr. J. M. Lang, and took up the matter with him of forming a corporation to handle this property, and made him a proposal that if he (Caldwell) would secure the necessary capital they would share the emoluments that might arise from the disposition of the property, and entered into an agreement with him to that effect. Mr. Brown Caldwell had been working on a proposition with Mr. Lang in regard to Tennessee phosphate, which fell through, and Mr. Howden had brought up this Florida proposition to Mr. Lang, who could not handle it, and who turned it over to Mr. Caldwell by introducing him to Mr. Howden. Thereupon, Caldwell and Howden talked the matter over and agreed on certain divisions. They agreed that Caldwell should try to sell the property first to various parties, among whom were Swift & Co., of Chicago. This first interview between Howden and Caldwell was early in January, 1907, and about a month later it was reduced to writing. During this time Caldwell tried a number of people, and consumed a good deal of time in attempted negotiations, and the time of the option was beginning to run short, and Mr. Caldwell approached Mr. Basinger, who knew that Caldwell was trying to place the property, and told him that he would make an arrangement with him if he could find parties who would be interested in the formation of a company to handle the property in Florida. Mr. Caldwell was a resident citizen of Savannah, Ga., at the time these transactions were had; had resided there three years, and was operating a turpentine property in Florida, and actually engaged in operating turpentine stills, and happened to get in the fertilizer business through his acquaintance Mr. J. M. Lang. His turpentine business was conducted in the name of Caldwell Company, headquarters or general office in the city of Savannah. He was at one time during the period of his residence in Savannah acting the part of a promoter. He testifies that he became interested in this phosphate proposition of Howden's not wholly as a promoter, but that it was true that, as a side issue from his naval stores business or turpentine business, he was partly a promoter, and it was as a promoter that he first got in connection with the phosphate proposition involved in this suit, which led to his acquiring an interest in it. Mr. Basinger, acting upon Mr. Caldwell's suggestion to him to find parties who would be interested in the formation of a company to handle the properties in Florida, brought Mr. Tennille and Mr. Caldwell together, who made an arrangement to meet Mr. Armstrong later, which they did, and talked over the possibilities of their financing a company to operate the Hertz-Lockwood property. The result of that conference was to bring Mr. Howden to Savannah, and the four talked over a general plan of financing the company. At this first conference between Howden and Caldwell and Tennille and Armstrong

in Savannah, the details of the negotiations were not all settled, and Howden returned to Florida, leaving the matter to be conducted through Caldwell and correspondence.

The negotiation matured rapidly, and a written memorandum of agreement between the parties was prepared by Mr. Basinger, signed by Mr. Caldwell, Mr. Tennille, and Mr. Armstrong in the presence of Mr. Basinger, and forwarded to Mr. Howden at his home in Florida for his signature. He, before receiving this memorandum of agreement executed by the parties at Savannah, had received propositions from other parties, and, instead of completing the memorandum sent him by executing it himself, arranged to have the other parties meet him in Jacksonville, Fla., and they thereupon went to Jacksonville, taking Mr. Basinger with them, where they met Mr. Howden on March 14, 1907. He brought with him the memorandum that had been signed by the other parties and forwarded for his signature, and at the opening of this conference he completed that memorandum by affixing to it his signature. This writing, he testifies, was a much briefer memorandum than the detailed memorandum of agreement which was immediately drawn up by Mr. Basinger to embrace more clearly the features contained in the briefer writing. As soon as it was prepared it was duly executed by the parties. This agreement is made by Howden and Caldwell, of the first part, and Tennille and Armstrong, of the second part, and provides that in the event that the survey and prospect of the property shall show pebble phosphate of a described quality and quantity underlying the lands, the second parties agree and undertake to organize a corporation for the purpose of purchasing the property, mining the phosphate, and paying the owners of the same in accordance with the terms of the option, viz., the sum of $40,000 in cash and the sum of 10 cents per ton of the phosphate as the same shall be mined, the cash payment to be available on or before April 1, 1907, at ―――― in the state of Florida; and, further, that the first parties shall be paid for the option held by them upon the property in the manner following: The second party shall organize the proposed corporation as soon as it shall appear from the prospect that the property contains the quantity and quality of phosphate specified; that such corporation shall have a capital stock not exceeding in amount $175,000, of which the sum of $150,000 shall be sold for cash, and the remaining $25,000 to be held in the treasury of the corporation and subject at any time to be taken up by the second parties for cash at par, or after dividends shall have accumulated on the same to the amount equal to the face value thereof, then this stock shall pass to and become the property of the second parties without further payment; that of the sum of $150,000 of the capital stock of the corporation to be sold for cash, the first parties undertake and agree, by themselves or through their agency, to take the sum of $60,000, and the second parties agree, in like manner, to take the sum of $90,000, with other provisions not necessary to be recited. Immediately upon the completion of the foregoing agreement, the parties made a supplemental agreement to increase the capital stock of the Florida Mining Company (the corporation to be formed under the terms of the above agreement) to the extent of $25,000 to be sold for cash, and the amount

to be applied to the purchase of additional property known as Palmetto Phosphate Company's lands near Mulberry, Fla., provided that options on these lands be secured upon satisfactory terms, and provided, further, that the property, after being prospected, shall prove to contain a minimum quantity of 500,000 tons of minable and marketable phosphate. On the instant, immediately after the execution of the supplemental agreement, Mr. Howden stated to Mr. Armstrong and Mr. Tennille that another party (not then naming him) had become interested in these mines, and that he (Howden) thought that he could make a better trade with this other party than he had made with Tennille and Armstrong, and wanted to know whether they would retire from the organization of the company, and, if so, on what terms. They told him that they would take the matter under consideration. The parties thereupon separated and returned to their respective homes from Jacksonville, Mr. Howden being authorized to obtain an option on the Palmetto property specified in the supplemental agreement. Tennille and Armstrong, after their return to Savannah, took the matter of their withdrawal under consideration, and prepared a memorandum of the terms of an agreement on the basis of which they were prepared to withdraw. Mr. Howden obtained the desired option on the Palmetto property and went to Savannah where he met the other parties. They discussed the memorandum which Tennille and Armstrong had prepared, showing the terms on which they would withdraw. This conference and discussion lasted many hours and broke up about 12 or 1 o'clock at night without anything being absolutely decided, closing with a remark by Mr. Tennille to Mr. Howden that he and Armstrong would consider a proposition from them (Howden and Caldwell) on the basis of 45 per cent. to Tennille and Armstrong, and 55 per cent. to Howden and Caldwell, of the interest in the contract which he might be able to make with Pierce, provided that contract was satisfactory to Tennille and Armstrong. And the matter was left in that shape at that time. This conference of parties took place on Wednesday, March 27th. On March 30th (Saturday), Caldwell wrote to Tennille and Armstrong:

"I beg to hand you herewith form of proposed agreement acceptable to Mr. H. L. Pierce for your consideration. Please let me hear from you in regard thereto as early as convenient and before noon on Monday."

On April 1st (Monday), Caldwell wrote again:

"In pursuance of the agreement between you and Mr. Armstrong and Mr. Howden and myself on last Wednesday that you would consider a proposition of division of profits on a basis of 45 per cent. to you and 55 per cent. to us, to the extent of 1,200,000 tons which might be derived from a contract which Mr. Howden might be able to make with Mr. H. L. Pierce, provided the terms of the contract between Mr. Pierce and Mr. Howden were satisfactory to you, I have submitted the form of contract which Mr. Howden finds he can make with Mr. Pierce. I now ask that you advise me whether the terms of the contract submitted are satisfactory to you, so that I may submit the proposition as to division of profits between us, outlined above."

To which Tennille replied the same day:

"I have just received your favor of this date relating to transactions between yourself and Mr. Howden, on the one part, and Mr. George F. Armstrong and myself on the other. We have examined the form of proposed

contract submitted by you to be executed by Mr. Pierce and Mr. Howden, and we now beg to say, in response to your letter, that we are prepared to accept the proposition of division of profits under this proposed contract on the basis of 45 per cent. to ourselves and 55 per cent. to yourself and to Mr. Howden; provided, however, that the contract between Mr. Howden and Mr. Pierce is redrafted so as to incorporate certain features and provisions which are essential, not only to ourselves, but, we think, also for the protection of Mr. Howden, as the principal. * * * We should be glad to take the matter up any time this afternoon between 4 and 6 o'clock."

## To which Mr. Caldwell answered:

"Replying to your communication of this date in which you state that you are prepared to accept the proposition of division of profits under the proposed contract between Howden and Pierce on the basis of 45 per cent. to you and Mr. Armstrong and 55 per cent. to Howden and myself, as contained in my letter to you of this date, provided that the form of contract between Howden and Pierce is redrafted to incorporate certain provisions which you desire. I beg to say that until the changes in the contract are made known, it is impossible to say whether they would be acceptable to Howden and Pierce and myself. If you will kindly note on the contract the provisions you wish inserted or changed, and will return it to me, I will immediately take up the question with Howden and Pierce."

## On April 3, 1907, Tennille wrote Caldwell.

"We return herewith draft of proposed contract between Mr. Howden and Mr. Pierce, which is acceptable to us and which we think should be satisfactory to Mr. Howden. It is important that the agreement be executed at once, or that we should be advised immediately whether or not it will be executed, so that, in the event negotiations with Mr. Pierce should fail, we may be in a position to comply with the provisions of our agreement with Mr. Howden and yourself, and be ready to finance our proposed company by the 21st instant."

## On April 13th, Caldwell wrote Tennille:

"Complying with your request, I submitted the form of contract, as drawn by your attorney, to Mr. Howden, and asked him to submit that form to Mr. Pierce for his acceptance. I am now advised by Mr. Howden that the form of contract submitted by you is not acceptable to Mr. Pierce, and that Mr. Pierce would not agree to a contract on those lines, but that Mr. Pierce was ready to accept and make a contract with Mr. Howden on the lines of the contract herewith. Will you not kindly compare the two forms of contract and advise me at your earliest convenience whether or not you would accept the contract acceptable to Mr. Howden and Mr. Pierce as basis for a proposal from Mr. Howden and me to divide our profits on such a contract with you and Mr. Armstrong on the terms agreed upon?"

## To which Mr. Tennille replied on the same day:

"I have your letter of this date, inclosing form of contract which you say is acceptable to Mr. Howden and to Mr. Pierce. Mr. Armstrong and I have examined this draft of agreement and now advise that it is acceptable to us, upon the condition that this agreement shall be executed prior to the 21st instant, the day when our agreement with Mr. Howden and yourself expires, and upon the further condition that Mr. Howden shall, on or before that day, assign to Mr. Armstrong and to myself jointly forty-five per cent. (45%) of his right, title and interest under this agreement to be entered into between himself and Mr. Pierce."

## On April 15th, Tennille wrote again to Caldwell:

"Referring to your telephone conversation with me this morning, requesting that Mr. Armstrong and myself now submit a form of agreement with Mr. F. J. Howden, to secure our interest under the proposed agreement be-

tween himself and Mr. H. L. Pierce. We beg to say that, having approved the form of·agreement with Mr. Pierce, submitted by you on behalf of Mr. Howden, and having accepted the proposal of Mr. Howden and yourself, to take 45 per cent. of the right, title ·and interest under this contract, based on a total output for both properties of twelve hundred thousand tons of phosphate, we will be ready and willing to execute. a formal contract covering our interest in this agreement, as soon as we are advised that Mr. Howden and Mr. Pierce have executed the contract which you submitted to us for approval on the 13th inst. The time is short, and we do not think the execution of this principal agreement should be further delayed for the purpose of preparing the formal contract securing our proportionate interest under it. As it is necessary for us to arrange to carry out at once the terms of the agreement of March 14, 1907, with Mr. Howden and yourself, in the event the agreement with Mr. Pierce is not closed and executed, we must request that you promptly confirm our acceptance of the proposal submitted on behalf of Mr. Howden and yourself, and advise us immediately whether or not the proposed agreement with Mr. Pierce has been or will be executed."

To which Mr. Caldwell replied the next day, April 16th:

"Your favor of the 15th inst. is received. I have communicated with Mr. Howden and informed him that the form of the proposed contract between Mr. Howden and Mr. Pierce, submitted to you in my letter of the 13th inst., was acceptable to· you and Mr. Armstrong. I understand from your letters of the 13th and 15th inst. that ·your idea of the contract to be executed between. myself and Mr. Howden and yourself and Mr. Armstrong is to be in the form of an assignment of an interest in the Howden-Pierce contract. Neither Mr. Howden nor myself understood that the contract between myself and Mr. Howden with you and Mr. Armstrong was to be in the form ·of an assignment of the Howden-Pierce contract. Our understanding was that our contract with you and Mr. Armstrong was to be an agreement between us by which you and Mr. Armstrong would receive 45 per cent. of the profits coming to us under section 8 of the Howden-Pierce contract, on the basis of the first twelve hundred thousand tons of phosphate sold and paid for. However, I have communicated to ·Mr. Howden your ideas in this connection, and will, at the earliest possible time, let you know his views on the subject."

Immediately on the same day, Tennille and Armstrong joined in the following letter to Caldwell, which they had delivered by a special messenger, ·saying:

"Your letter of this date received. We note you say: 'I understand from your letters of 13th and 15th inst. that your idea of the contract to be executed between myself and Mr. Howden, and yourself and Mr. Armstrong, is to be in the form of an assignment of an interest in the Howden-Pierce contract.' This is correct. In all our negotiations with respect to this matter, we have contended that our interest should be secured by an assignment of a proportionate part of the contract with Mr. Pierce, and you will remember that in our earliest negotiations the ·offer was of a certain 'percentage of the Pierce contract.' This is the proposal we accepted. Again, at the meeting in my office, with yourself, Mr. Armstrong, and our attorney, item 6 of the pencil memorandum of changes required by us in the first draft of the Pierce contract, which read as follows, was submitted. to you: '6. Howden shall have right to assign contract for the benefit of his associates and assigns.' At that time you stated that you could see no objection to our proposed changes. Under these circumstances, we do not see how you could have had any other understanding than that we expected to receive an assignment of a proportionate interest in this Pierce contract."

And on the same day, Tennille and Armstrong joined in a telegram to Howden in these words:

"We approved on Saturday your proposed agreement with Pierce submitted by Caldwell, and accepted your proposal for division of interests under it.

Notified Caldwell important to have immediate advice of execution of Pierce agreement, but understand he still holds papers here. This is unnecessary delay. Unless we are advised by you before noon 18th instant that proposed agreement with Pierce is executed, will be necessary for us to carry out terms of our original agreement, dated March 14th, which we are prepared to do. Please answer."

On the same day Howden answered by telegram:

"Proposed agreement with Pierce will be formally executed eighteenth. Will write particulars when complete."

On the next day, April 17th, Caldwell wrote to Tennille:

"I have been requested by Mr. Howden to advise you that he will execute the contract with Mr. Pierce today. This is probably in connection with your wire to him of yesterday, copy of which I have, and in answer to my wire of the same date. All recent correspondence exchanged between us has been forwarded to Mr. Howden for his consideration."

On the next day, April 18th, Howden wired Tennille:

"Pierce contract with some minor changes sanctioned by me will be executed in Bartow to-morrow. Your obligations may be considered canceled."

On the same day, Tennille replied by wire to Howden:

"Must have absolute notice execution of Pierce contract to-morrow, and will not consent to any essential changes in draft which we have approved."

The next day, April 19th, Howden wired Tennille:

"Cann and Barrow agreement duly executed between Pierce and self, with no alteration that in any way affect your interest. Advise Caldwell."

After completing his contract with Pierce, the complainants demanded of Howden that he assign to them their 45 per cent. interest therein, which he refused to do, and this suit was brought by the complainants, Tennille and Armstrong, both citizens of Georgia, to obtain from the court a decree that the defendant Howden specifically perform his agreement with them, and that he be compelled to execute and deliver immediately a sufficient assignment or transfer to them, jointly conveying to them 45 per cent. of all his right, title, and interest in and to the agreement with H. L. Pierce, dated April 19, 1907 (exclusive of the salary to be paid to Howden), to the extent of the estimated output of 1,200,000 tons of phosphate rock to be mined and sold from the lands covered by the agreement.

It is not necessary to recite the pleadings of either party. They are appropriate to the respective contentions. The complainants contended that Howden acquiesced in and accepted the terms and conditions upon which they abrogated their agreement of March 14th; that by virtue of that abrogation they canceled their valuable contract rights in the phosphate lands and in the options of agreements to purchase the same, and the rights and profits to accrue to them under the marketing of the phosphate thereon, and that Howden, acting with full knowledge and information as to the terms of the arrangement upon which they approved the proposed agreement between himself and Pierce, proceeded to the execution of that agreement with Pierce on April 19, 1907; that Howden, attempting to evade his solemn promise and agreements, has offered to them an entirely different interest in

the contract with. Pierce from that which was agreed between .complainants and Howden and which is materially against complainants' interests; that his refusal to perform his agreement will cause them· great and irreparable damage, which is not susceptible of accurate calculation, and which cannot be fully and adequately compensated by a judgment for damages, which complainants allege will far exceed the sum of $50,000; and they further allege that Howden is unable to respond in such damages to complainants for the breach of his contract; that by reason of their abrogation of the original agreement of March 14, 1907, and by reason of the subsequent execution by Howden of the agreement with Pierce, complainants cannot now be restored to their original rights and privileges in said options and property, and cannot now take over said properties and operate the same for their mutual benefit and profit, which they were and are financially able to do and ready to do, had not said Howden made the representations he did. The suit proceeded to the hearing, and the Circuit Court decreed that the bill of complaint be dismissed without costs and without prejudice to any suit, either at law or in equity, which complainants may bring to recover 45 per cent. of the profits arising from the operation of the Florida Mining Company accruing to F. J. Howden and Brown Caldwell as holders of an interest in said Florida Mining Company. In connection with this decree, we recite the following opinion of the trial judge:

   · "This cause having been heard upon the bill, answer, and testimony, and the arguments of solicitors for the respective parties, and being duly considered by the court, the court finds that the only contract or agreement made between the complainants in regard to division of interests in the proposed mining corporation was that proposed by Caldwell in his letter of April 1st, and accepted by Tennille in his letter of the same date, and that was an agreement for sharing the profits of Howden and Caldwell, 45 per cent. to the complainants and 55 per cent. to the defendants; that the subsequent proposition in Tennille's letter of the 13th of April, for an assignment of 45 per cent. of the right, title and interest of Howden was never accepted so as to become a contract which could demand specific performance; that the defendant is willing and ready at any time to carry out the contract or agreement it did enter into; that the executing the contract with Pierce by Howden upon the urging and insistence by Tennille, when the proposition for an assignment of Howden's right, title and interest had not been accomplished, was not an acceptance of such proposition as perfected such an agreement as would justify a decree for a specified performance. The court further finds, that Howden had conveyed to Caldwell, for consideration, an interest in the option which he had, before any negotiations with the complainants, and that Caldwell is a necessary party to any determination of the rights of the parties; that he had been recognized as principal in all the correspondence and negotiations, and was only treated as a broker in the bill of complaint in order to give jurisdiction to this court."

The complainants appealed, and assigned that the court erred in dismissing. their bill. of complaint and in entering a final ·decree in favor of the defendant, Howden, and in not rendering a decree in favor of complainants for the specific performance of the contract by the defendant, F. J. Howden, as prayed for in the bill of complaint. After a careful study of the record of this case, we conclude that the Circuit Court did err in the matter and to the extent suggested. by the appellants' assignment.

Besides, the written memorandums of agreement and the letters and telegrams which passed between the contracting parties, the substance of which we have recited, Tennille and Armstrong and Howden and Caldwell were fully examined as witnesses, and we gather from their testimony, in connection with the written evidence, that the deal between Howden and Hertz had been pending for some time, probably two months, before it ripened into the written option which bore date the 20th of February, 1907. The 140 acres described in that option had been worked for phosphates under primitive and inadequate methods, and the work had been abandoned; but more scientific methods were beginning to be used, with which Howden, in his employment as general manager of the Prairie Pebble Company, had become acquainted, and in which he had faith, and he had satisfied himself that this abandoned field of 140 acres contained at least 700,000 tons of minable and merchantable phosphate. It appears that at that time the market demand for phosphates of good quality was good, and that such products were reputed to be worth $5.50 per ton f. o. b. at the mines. He, therefore, closed with Hertz on the terms specified in the writing of February 20th, and which appear to have been entirely satisfactory to Hertz, and which appeared to Hull, the president of the Prairie Pebble Company, to be too liberal, for when Howden approached him on the subject of his taking this property, he intimated that he could get the land cheaper if he ever should need it. The life of Howden's option, beginning February 20th, was, at that time, limited to close by or before the end of March 31st. Howden's office of general manager of the Prairie Pebble Company kept him at his work. He was not financially able to furnish or secure the cash payment required to enable him to reap the benefit of his option, and in looking around for some one to help him find parties who could finance his venture, he came to an agreement with Caldwell, who undertook to find the parties able and willing to finance the scheme on terms which Howden was willing to accept. Caldwell immediately became active. He himself was a citizen of Georgia, residing at Savannah, engaged in the naval stores business, actively operating turpentine plants in Florida, but at the same time somewhat of a promoter, having had relations with Tennessee parties and with heavy capitalists in Chicago. For these, however, the deal that he was now attempting was not attractive, possibly because, as Hull suggested with reference to himself, it was not large enough to engage their attention. Howden's option was running short, and Caldwell applied himself to discovering what he could do in Savannah. He had some acquaintance with F. G. Basinger, who, as their attorney, had had relations with Tennille and Armstrong, and had some knowledge of their financial ability and business capacity to meet Caldwell's and Howden's present needs if the proposition could be made attractive to them. Thereupon the negotiations began, which, in a few days, resulted in a written memorandum of agreement drawn up by Basinger and signed by Caldwell, Armstrong, and Tennille in the presence of Basinger, and forwarded to Howden at his home in Florida for his signature. By the time this reached Howden, he had begun to have conferences on the subject with Pierce, and, instead of signing the agreement sent him and returning it to the Savannah par-

ties, he arranged to have them meet him in Jacksonville, where they met on the 14th of March, his option then having only 14 days to run. At this meeting the first thing that was done was the completing of the agreement, which had already been signed by the other parties, by the signature of Howden. Then his option with Hertz was safe, for Tennille and Armstrong were fully responsible parties, their engagement could be relied on, as the contingency specified in their agreement was one which Howden knew the survey and prospect, then going on, would amply meet. When this was done, he told the parties that the Palmetto 1,100 acres, nearer the railroad, which had been operated under primitive methods and the operation abandoned, could, he thought, be obtained at a reasonable price, and was very desirable because it was between the 140 acres and the railroad. Thereupon, immediately the parties entered into the supplemental agreement which authorized the acquisition of this additional land if it could be obtained on reasonable terms, and if the survey and prospect showed that it contained at least 500,000 tons of minable and merchantable phosphate. When that was done, and immediately upon its execution, Howden mentioned having found parties or a party in Florida with whom he thought he could make a better trade if Tennille and Armstrong would agree to withdraw on reasonable terms. He did not name the party, and Tennille and Armstrong replied that they would consider the matter, which, upon their return to Savannah, they promptly and carefully did, and prepared the memorandum of the terms on which they would be willing to withdraw. Pending these negotiations at Savannah, Howden satisfied himself as to the phosphate bearing quality of the Palmetto 1,100 acres of land, and obtained the desired option to purchase it, and went himself to Savannah, where all the parties met on the 27th of March, and had a protracted and earnest discussion of the terms on which Tennille and Armstrong were willing to let Howden and Caldwell deal with the other party who, by this time, had been named as H. L. Pierce. Howden had taken the option for the Palmetto property in his own name, and in this conference on the 27th of March, he suggested that the interest of Tennille and Armstrong did not extend to that property, but they were able to satisfy him that he was mistaken about that. The discussion then revolved around the written set of propositions which Tennille and Armstrong had prepared. One of these propositions was for a cash settlement, which Howden and Caldwell declined; the other was for the formation of a mining company to operate the property and divide the benefits. The concluding paragraph of the last proposition was:

"It is further understood that the benefits accruing from the alternative proposition to be divided 50 per cent. to Caldwell and Howden and 50 per cent. to Tennille and Armstrong."

Tennille testifies touching this matter:

"There was a great deal of discussion and a great deal of trading back and forth. I remember at one time during the session Mr. Howden turned to me and said, 'Well, will you make a contract with me?' and I said, 'Mr. Howden, I do not think that we could make a contract with you without proper security, as we do not know anything about your financial responsibility.' At any rate, we broke up about 12 or 1 o'clock that night without anything being absolutely

decided, and the last remark that I made to Howden, when he left the office, was that we would consider a proposition from them on the basis of 45 per cent. to us and 55 per cent. to him of the interest in the contract which he might be able to make with Pierce, provided that contract was satisfactory to us; and that matter was left in that shape at that time."

On Saturday, March 30th, three days after the conference just mentioned, Caldwell transmitted to Tennille and Armstrong, for their consideration, a copy of the agreement which Howden could make with Pierce, with the request that they let him hear from them in regard thereto as early as convenient and before noon on Monday. This copy was an instrument containing the whole contract in two sections, and made no express provision that Howden should have the right to assign any part of the contract for the benefit of his associates and assigns; and the complainants required, before they would approve it, that this form of the proposed contract should be redrafted, and a little later submitted a redraft prepared by their attorney, embracing the substance of the memorandum copy which had been furnished them, with some additional provisions, especially this:

"The party of the first part shall have the right to transfer, assign and set over all or any part of his rights, title or interest in or under this present agreement, or in or under the proposed agreement between himself and said company, upon the organization thereof, except as to the provisions of said last-named agreement relating to the personal services of the party of the first part as its general manager."

This redraft by complainants' counsel was not acceptable to Mr. Howden and Mr. Pierce, and on the 13th of April, Caldwell submitted another draft of the agreement to the complainants, which they examined and advised him that it was acceptable to them upon the condition that it should be executed prior to the 21st day of April, the day when their agreement with Mr. Howden and Mr. Caldwell expired, and upon the further condition that Mr. Howden should, on or before that day, assign to Armstrong and Tennille, jointly, 45 per cent. of his right, title, and interest under the agreement to be entered into between himself and Mr. Pierce. It is not necessary to recite again the subsequent correspondence by letter and wire. It seems to us that the evidence shows that the complainants manifested to Howden and Caldwell at every point in the negotiations on this subject that they would not surrender the rights they had in the property itself under their agreement of March 14th, except on the terms of retaining 45 per cent. interest in all the rights, title, or interest of Howden in or under the Howden-Pierce agreement, or in or under the proposed agreement between himself and the company for which the Howden-Pierce agreement provided, upon the organization thereof, except as to the provisions of said last-named agreement relating to the personal services of Howden as its general manager. That Howden and Caldwell did not wish to consent to this is very manifest from the correspondence. It is equally manifest that Tennille and Armstrong insisted upon it. It seems to us that there is no ground in the testimony to doubt that Howden and Caldwell must have understood this clearly, and that, when so understanding it, they determined to go ahead and enter into the Howden-Pierce agreement, and Howden telegraphed to Tennille and Armstrong, "Pierce contract, with some changes sanctioned by me, will

be executed in Bartow tomorrow; your obligations may be considered canceled," they cannot be heard to say that they did not accept the terms named in Tennille's letter of April 13th to Caldwell.

Cannot a righteous and effective decree of a court of chancery, which commands the conscience, compel the specific performance of this contract, which they are estopped to deny that they made? The counsel for the complainants urges with convincing force these considerations presented by the proof bearing upon the question we have just propounded. The contract is fair and founded upon a large and valuable consideration, the abrogation of an existing contract, upon which complainants place a cash value of $50,000, and for which they refused an offer of the defendant to pay them $5,000 a year for a term of 10 years. It is a contract in which damages could not be calculated, and in which they would clearly be inadequate. . It is capable of being enforced by a decree of the court. It does not call for personal or continuous services. It will work no hardship whatever upon defendant. It will not deprive him of anything to which he is entitled, nor impose the slightest liability upon him. A decree would require simply the assignment to be made by defendant to complainants of that which he admits they are the beneficial owners, and the title to which now rests in his name. The complainants have fully performed on their side, so that no question of mutuality is involved. The defendant has sufficient title, and is able to perform. The necessary parties and the subject-matter are properly before the court. There is no difference or dispute as to the amount of complainants' percentage or interest. The question is solely as to the manner in which they shall receive their part. The defendant contends that the obligation is simply to pay complainants annually 45 per cent. of such profits as he may receive under the Howden-Pierce contract from year to year. The complainants contend that the contract was for a division of the interests or profits in the Howden-Pierce contract, and the assignment by defendant to them of their 45 per cent. The agreement made was not one for the payment by defendant, or by defendant and Caldwell jointly, to complainants of 45 per cent. of the profits to be received by defendant, either annually or otherwise; and the negotiations between the parties, based upon a division of profits or interest, were not for annual payments by Howden to complainants. The correspondence refers in each instance to the expected division. There was not a single suggestion of annual payments to complainants in the negotiations or correspondence making up the contract. The preliminary negotiations between the parties were confined to an effort to determine the exact amount of interest in the new venture which the complainants would accept in consideration for canceling their rights under the old contract. These negotiations were not at that stage directed to the form or manner in which that interest should be expressed. Complainants finally agreed to consider a proposal of 45 per cent., provided the terms of the new contract were made satisfactory to them. When the first draft of the Howden-Pierce contract was submitted to complainants by defendant, through Caldwell, as the basis for a proposal, they found that it did not contain a provision expressly permitting the defendant to assign any part of it. Complainants thereupon presented to Caldwell

a written memorandum of changes in the form of this contract, one of the proposed amendments reading:

"Howden shall have right to assign contract for the benefit of his associates and assigns."

They required that this provision should be incorporated in the contract. Defendant and Caldwell acquiesced in this demand. If complainants were not to have any assignment of any part of that contract, would they have been anxious that Howden be given the right in express terms, to dispose of it to others? If their contract was merely to receive certain payments from him annually, would complainants have insisted upon a provision expressly giving the means to defendant by which he might, if he chose, defeat their right to receive from him these annual payments? The evidence of Caldwell illustrates the insistence which complainants made with reference to this provision for assignment, and their reasons for it. The provision for an assignment, as drawn by complainants' counsel, was accepted by defendant, and incorporated verbatim in the Howden-Pierce contract as he finally executed it on April 19th. Their insistence upon this provision in the early stages of the negotiations was of itself clear and plain notice to the defendant and Caldwell that complainants expected and demanded that their interest should come to them by an assignment from Howden. When the defendant acceded to this demand and inserted in the Howden-Pierce contract, word for word, the formal provision for assignment as prepared by complainants, his action was a complete acquiescence in, and acceptance of, their claim to an assignment; and, having secured complainants' approval in this manner, he is estopped to deny their right to it. The complainants' interest under the Howden-Pierce contract is almost equal to that of defendant and Caldwell; that is, 45 per cent. as against 55 per cent. Why should that interest be represented solely by the promise of defendant to pay them their proportion when he receives it? Why should their interest be transmitted through defendant and be subject to the hazards which such transmission might entail? Neither Pierce nor the Mining Company can complain of the assignment since the Howden-Pierce contract expressly provided for the defendant's right to assign it in whole or in part. Nor will Caldwell be affected by such a decree, because he has already received a direct assignment from defendant covering his interest. The performance of the contract, therefore, not only imposes no hardship upon the defendant, but would not in any respect operate to injure or affect the rights of other parties to the Howden-Pierce contract, or those having an interest therein. No valid argument or reason can be advanced, upon the facts set forth in this record, to show that in equity and good conscience complainants are not entitled to have an assignment as they claim of their proportionate interest in the Howden-Pierce contract. On the contrary, every consideration of fair dealing demands that complainants' interest be vested in the Howden-Pierce contract direct, in accordance with the understanding and agreement which they made. The business of the mining company, which assumed the Howden-Pierce contract, is under the sole charge of the defendant, Howden. The mining company is in-

corporated under the laws of Maine; its principal office is in the state of Massachusetts, where its president and chief owner resides, but its only business and property is located in Florida. Defendant receives a large salary as its general manager. Its operations in Florida, and therefore its earnings, are under the management and control of the defendant. All expectation of profit under the Howden-Pierce contract is dependent upon the operations of the mining company under the defendant's charge. It would be unjust and unfair in the extreme to require that complainants' large interest in the result of the operations of this mining company reach them only through the medium of the defendant and in such measure as he may determine. If defendant's intentions in regard to complainants and their interest in this contract are straightforward and honest, he cannot have any valid objections to assigning their interest to them, and if his intentions in this respect are not honest, then there is all the more reason why complainants should be protected by an assignment.

Assuming the facts of this case to be such as the foregoing opinion shows we have concluded from the proof that they are, the principles and practice of courts of equity, applicable thereto, are so far elementary and are so well settled as to dispense with the citation of authority in support of the conclusions of law embraced in our decree. It follows that the decree appealed from must be and is hereby reversed. And this court will here and now pass its decree that the defendant, Howden, specifically perform his agreement with the complainants, and execute and deliver to them immediately a sufficient assignment or transfer to them, jointly conveying to them 45 per cent. of all his rights, title, and interest in and to the agreement between himself and H. L. Pierce, dated April 19, 1907 (exclusive of the salary to be paid to the defendant, Howden), to the extent of the estimated output of 1,200,000 tons of phosphate rock to be mined and sold from the lands covered by that agreement.

And it is so ordered.